Taylor, Chief Justice.
The circumstances of this ■case, and the arguments addressed to the Court, render it necessary, in my apprehension, to consider two questions. 1st. Whether the title of the lessors of the plains tiif is valid, independently of the act of 1801, cap. 575. And if it be not valid, v ithout the aid of that act, then, 2dly. Whether that act is repealed by the act of 1808, cap. 739. The second section of the first act, provides that, where any person shall die seised of real estate of inheritance in this state, leaving descendants, or other relations, citizens of the United States, who would according to law inherit, were all the nearer descendants or relations extinct, but who according to the now existing laws, cannot inherit, because there may be others who, if citizens, would be entitled to inherit, but being *276 aliens cannot hold lands in this state, whereby such estate would escheat; in such case the nearest descendant, or relation, of the deceased, being a citizen of the United States, shall inherit. The lessors of the plaintiff are the grand nephew and nieces of James Rutherford, the person last seised of the land in controversy; and in claiming as heirs to him, they must unavoidably derive their title through their father, W. B. Rutherford, who is an alien. Upon common law principles, this would form an insuperable impediment to their right; for, in immediate descents, a disability by alienism, not only in the parties, but in any intermediate ancestor, through and by whom the descent is made, will prevent it taking effect. Thus, if the son of an alien be a citizen, he cannot inherit to his grandfather, nor to his uncle, because he must claim through his father, who was not inheritable. But, where a person does not so claim, by right of representation, through an alien, it is no obstacle to the descent to him, that the nearest heir is an alien: as, where there are three brothers, all aliens, and the two youngest were naturalized, and the eldest had issue, then the third brother died; it was adjudged that the land could not descend to the eldest brother, or to his issue, because he was incapable himself, and his issue cannot claim but by representation; therefore it shall descend to the second brother. (3 Salk. 130.) On this principle and distinction it was held, in the case cited from 4 Wheaton, that when a person dies leaving' issue who are aliens, the latter are not deemed his heirs at law, for they have no inheritable Mood, and the estate descends in the same manner as if no such alien issue were in existence. As the claimants in that case were the nieces of the person last seised, who was a citizen, but whose issue were all aliens; and as the ancestor of the claimant was a citizen, it was not necessary to the decision of the cause to state the alternative branch of the proposition, and declare how the law was where a person claimed through an alien. That case would be an *277 authority for the present, provided J. Rutherford, had left an alien brother, and a nephew a citizen, whose father had also been a citizen; the alien brother would not obstruct the descent to the nephew, but would be overlooked, or ¿set aside in his favour, although nearer in degree. The distinction between the failure of hereditary blood by reason of alienism, and by means of attainder,, showing that the next heir will take in the first instance, but not in the last, is stated in Co. Lit. 8. a. But it is more perspicuously summed up in the law of forfeiture, (p. 7£.) “ When a man was not capable of civil right by nature, as an alien born, and never naturalized, being unknown to the law, he was excluded from inheriting; and the next of kin within the allegiance', who did not claim under him, was admitted; or when he had incurred civil disabilities, by his own voluntary act, not criminal, as one who entered into religion, or abjured the realm, he was taken to have undergone a civil death, and the next in course of descent entered. But when he is attainted of treason or felony, the law will not pass him over, and marks him out in rei exemplum et infamiam. Hence it is, that though he was never in possession, nor those who claim under him more capable of inheriting than he by reason of the consequential disability arising from the attainder of the ancestor, yet the estate will be interrupted in its course to the collateral, and escheat. Reasons of political expediency may be deduced from the struct ture of peculiar governments for this distinction. But in the view of reason and justice, the estate ought to go to ■the next collateral branch in the case of attainder, as well as in that of alienism; since it is not necessary for the collateral to derive his title, in either case, from the disqualified person, but may make it from a common ancestor. It seems to me to follow incontestibly, that the act of 1801, before cited, bears directly on the case; and if it be repealed, the land has escheated. 2ndly. The act was made for the purpose of regulating descents, in cer - *278 tain cases, and is conceived in a spirit of justice applxca-ble to any system of descent, and founded on a policy that . , , , „ , ,, . is permanent and universal, b or whether primogeniture prevail, or a distribution among all, the children, it is equally equitable in principle, and conducive to the welfare of the republic, that the title by escheat should not take place, while there are any relations of the deceased, who are members of the state; that it should not prevail over the claims of a widow. The act of 1808, which it is agreed has operated a repeal of the first, establishes cer- • tain canons of descent, which must prevail whenever they are inconsistent with any former regulation on the same subject. Its design was to trace the course of descent, according to the degrees of relationship in which the parties stood to the person last seised,. leaving all the qualifications and disqualifications to be ascertained by the existing laws. None of these enter into the purview of the act; they are settled by other principles, and depend ■upon a distinct policy. The common law, modified as it has been by several acts, must be resorted, to, to form a construction upon every part. Deprived of this essential aid, we shall be met by difficulties and absurdities at evei*y step we take. The first canon provides,' that inheritance shall lineally descend to the issue of the person last seised. When we inquire what issue? the common law answers, that they must be citizens; but the act construed without this aid, would make aliens inheritable. The common law would add, the heirs must also be legitimate; but an act passed in 1799, makes natural children inheritable to their mother in certain cases, and, to each other. Who can believe that the act of 1808 designed to repeal that law? Again, must the issue be in full life at the death of the ancestor? The act itself does not instruct us; but the common law answers, that posthumous and after born children are entitled to inherit. It appears to me that the two acts are perfectly reconcile-able with each other, and that to construe the last, a re *279 peal of the former one would do manifest violence to the intent of the legislature, who, by their express decía-ration, repealed only such laws as come within the meaning and purview of the act of 1808. I think the act of 1801 comes within neither, and the plaintiffs are entitled to judgment,
Hall, Judge.
The object of the act of 1801 was to permit citzens to inherit the estates of their deceased relatives, although there were other persons more nearly related to the deceased who were aliens; that estates should take the same course of descent among citizens, as if there were no alien relatives in existence who might intercept them.
I think the act of 1808 intended to regulate descents ¡ among citizens, in the number of which were included those to whom the act .of 1801 had imparted heritable blood; and not to revive (as to them) the obstacles which before that time stood between them and inheritances.The act of 1808, as I think, did not intend either to create new heirs, or to take away heritable blood from those who had it before that time: if it intended the latter, we may as well admit that it intended the former; and if so, it will have the effect to repeal that part of the common law which declares that aliens shall not inherit real estates; for the act declares that, in particular cases, lands shall descend to the next collateral heirs of the person last seised, and some of those heirs may he aliens, of whom the’act of 1808 makes no mention.
Again* giving this construction to the act, it would repeal the act giving heritable blood to bastard children, for that act declares that such children may inherit from their mothers and from each other, which by common law they could not do. But 1 think that the two acts of 1801 and 1808 may stand well together; that it was not the object of the legislature, by the last act, to repeal the provisions of the first. I am therefore of opinion, that judgment should be given for the plaintiff.
*280 Henderson, Judge.
The act of 1808 forms of itself, a comP^e system of descents, so far only as regards the question of consanguinity. So far, and so far only, all P™1* laws afe abi’ogated by it, as coming within its purview and enactments. It affects not the law of descents in any other point. An alien son or brother is not, by that act, called to the inheritance, although the first may be the issue of the person who died actually seised, or the second the next collateral relation of such person, there being a failure of his issue. The law of alienage being unaffected by the act, as not relating to the question of consanguinity, upon which alone the act of 1808 operates. It is therefore not within its purview, that-is, provisions. A person must, therefore, so far as regards consanguinity, bring himself within the rules prescribed by the act of 1808; for that act repeals all prior rules on that subject. But with personal qualifications or disqualifications, that act has nothing to. do. It does not repeal them whether imposed by the common or statute law.. That the act of 1808 embraces the rules and orders by which the consan-guinii shall be called to the succession, is apparent -upon its face, for it is silent as to all other rules;'nothing is said on the subject, where there are no consanguinii, or none who can take. The title of the lord by escheat, the widow under the act of 1801, are left to the opera- . tion of prior laws. In fact, if the act of 1808 is an entire provision on the subject, as. I take it to be, it of course provides for the rule which it abrogates, b.y providing another rule; for on that the abrogation depends. Where then are its provisions for the present case? What other person' does it call to the inheritance? To whom would the act of 1808 give this property? To no one. Then it has made no provision for it, Nor is it a casiis omissus; for it does not affect to make provision for it. The law, therefore, of 1801, under which the plaintiffs claim, interposes not between the plaintiffs and one claiming under the act of 1808; but between-the plaintiff and the state, *281 claiming under the law’s of escheat. I therefore consider the act of 1801 as unaffected by the act of 1808; and that the judgment of the Superior Court, should be reversed,